UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **The Hart Island Project, Inc.**<br>*Plaintiff*,<br><br>v.<br><br>**The Associated Press**,<br>*Defendant*. | Index No. 1:13-CV-01630-AJN<br>ECF Case<br><br>**Complaint for<br>Copyright Infringement**<br><br>Jury Trial Demanded |

# Summary of Complaint

In the summer of 2012, the Associated Press asked for a license to use footage from Plaintiff's film "Hart Island: An American Cemetery." The parties discussed terms, but never memorialized a final agreement. Instead of taking a license, the AP took the liberty of copying Plaintiff's film without compensation.

Plaintiff's film captures the somber isolation of Hart Island. Hart Island is New York City's potter's field; an island cemetery where prison laborers bury the City's unclaimed dead in mass graves. Predictably, the Department of Corrections prohibits filming on Hart Island.

Plaintiff, a public charity and independent filmmaker, spent 3 years negotiating with the Department of Corrections before receiving a special filming permit. The AP took a shortcut. Instead of securing its own permit, the AP simply copied the fruits of Plaintiff's diligent work and artistic expression.

The AP vigorously enforces its own copyrights and claims to believe in fair compensation for authors and artists. But when the AP uses footage from small filmmakers, there is some disconnect between what it believes and how it behaves. Plaintiff seeks an injunction and damages.


*Table of Contents*

**Background** ................................................................................................................ 3

    Parties ................................................................................................................... 3

    Jurisdiction and Venue ........................................................................................ 4

**Facts** ............................................................................................................................. 5

    Plaintiff's Copyrighted Film ................................................................................. 5

    Plaintiff's Copyright Ownership .......................................................................... 6

    Defendant's Request for Hart Island Footage .................................................... 6

    Defendant's Unlicensed Use ............................................................................... 7

    Defendant's Unlicensed Distribution .................................................................. 9

    Defendant's Willful Conduct ............................................................................. 10

**Claims for Relief** ........................................................................................................ 13

    First Claim:  Direct Copyright Infringement .................................................... 13

    Second Claim:  Secondary Copyright Liability ................................................. 14

    Third Claim:  Removal of Copyright Information ............................................ 15

    Fourth Claim:  Circumvention of Copyright Protection
    Systems ............................................................................................................. 16

    Fifth Claim:  Unjust Enrichment ....................................................................... 18

**Relief Requested** ...................................................................................................... 19

    Demand for Jury Trial ....................................................................................... 20

## BACKGROUND

### PARTIES

1. **Plaintiff:** The Hart Island Project, Inc. ("**HIP**" or "Plaintiff") is a New York not-for-profit corporation and 501(C)(3) charitable organization. The HIP's principal place of business is 8 South Division Street, Peekskill, NY 10566.

2. **Defendant:** The Associated Press ("**AP**" or "Defendant") is a New York not-for-profit corporation headquartered at 450 West 33rd Street, New York, NY 10001.

3. **Non-Party Individuals**:

    a. **Bonny Ghosh** is a reporter for the AP.

    b. **Melinda Hunt** is the executive director of the HIP, and the original author and producer of the film "Hart Island: An American Cemetery" (the "**Copyrighted Film**").

## JURISDICTION AND VENUE

4. This is an action for copyright infringement pursuant to 17 U.S.C. § 101 *et seq.*, as well as breach of contract and unjust enrichment under New York law.

5. **Jurisdiction** in this Court is proper pursuant to 28 U.S.C. § 1331 because certain claims arise under federal law; and pursuant to 28 U.S.C. § 1338 because certain claims are for copyright infringement.

6. **Venue** is proper pursuant to 28 U.S.C. § 1391, because Defendant has a principal place of business in this District. Venue is also proper pursuant to 28 U.S.C. § 1400 because Plaintiff's claims arose in this district.

# FACTS

7. Hart Island is New York City's potter's field. It is the cemetery for the City's unclaimed dead.

8. The NYC Department of Correction operates the Hart Island cemetery. Prison laborers bury the deceased in mass graves.

9. The Department of Correction's burial records are incomplete and often inaccurate. The records were inaccessible until 2008, when Plaintiff obtained them through the Freedom of Information Law, and published the records in an online database.

10. The Department of Correction limits access to Hart Island itself, and forbids filming on the island.

11. Plaintiff, The Hart Island Project ("**HIP**") is a 501(c)(3) charitable organization dedicated to making Hart Island's burial records accessible "so that no one is omitted from history."  The HIP helps families access burial records and locate lost relatives.

## PLAINTIFF'S COPYRIGHTED FILM

12. Filming on Hart Island is generally forbidden, and exceptions are rarely granted. Plaintiff negotiated with the Department of Correction for *three years* before receiving permission to film on Hart Island.[1]

---

1 Note: In December of 2012, after all relevant events took place, the DOC liberalized its press access policy.

13. Since negotiating permission to film on Hart Island required substantial effort, Ms. Hunt meticulously planned her filming to capture footage expressing the somber isolation of an island cemetery for unclaimed bodies and forgotten lives.

14. After filming on Hart Island, Melinda Hunt and the HIP spent another two years editing the raw Hart Island footage, as well as other footage, into "Hart Island: An American Cemetery" (the "**Copyrighted Film**").

15. The Copyrighted Film is the story of four individuals and their six-year struggle to navigate the labyrinth of city bureaucracy in an effort to perform the most basic grieving rituals: visiting a grave, spreading the parents' ashes, and locating a body mistakenly buried.

## PLAINTIFF'S COPYRIGHT OWNERSHIP

16. Plaintiff owns the copyright to "Hart Island: An American Cemetery" (the Copyrighted Film).

17. The Copyright Office awarded copyright registration no. PA 1-819-870 to the HIP (for the Copyrighted Film) on September 13, 2012. A copy of the registration is attached as Exhibit A.

## DEFENDANT'S REQUEST FOR HART ISLAND FOOTAGE

18. In preparing the Potter's Field Video, AP reporter Bonny Ghosh received extensive assistance from Plaintiff and from Plaintiff's executive director, Melinda Hunt.

19. On August 16, 2012, AP reporter Bonny Ghosh contacted HIP Executive Director Melinda Hunt through the HIP website.

20. Ms. Ghosh asked to interview someone from HIP for an upcoming AP story. Although Ms. Hunt was traveling at the time, she offered to help Ms. Ghosh with her story, including by introducing Ms. Ghosh to various people associated with Hart Island and the HIP.

21. The following day, August 17, 2012, AP reporter Bonny Ghosh called Ms. Hunt asking for video footage of Hart Island shot from the ground.

22. Footage of Hart Island shot from the ground is rare and valuable. As discussed above, the Department of Correction limits access to Hart Island and forbids filming. Plaintiff HIP obtained a special filming permit only after 3 years of negotiations with the Department of Corrections.

### DEFENDANT'S UNLICENSED USE

23. The parties discussed various terms for a license agreement that would allow Defendant to copy and distribute footage from the Copyrighted Film.

24. However, the parties never memorialized a definitive agreement.

25. Without a license, AP Reporter Bonny Ghosh downloaded the Copyrighted Film and spliced its footage into the Defendant's report, "Identifying Remains in New York's Potter's Field." (the "**Potter's Field Video**").

26. Defendant's Potter's Field Video directly incorporated footage from Plaintiff's Copyrighted film. Defendant's direct copying includes at least the following shots:

    a.    Medium pan unidentified tombstone on Hart Island

    b.    Mid shot graveyard monument marking Potters Field

    c.    Wide shot cemetery in Potters Field with unidentified tombstones

    d.    Wide shot coastline along Hart Island

    e.    Tight tilt down graveyard monument marking Potters Field

    f.    Wide tilt up cemetery in Potters Field with unidentified tombstones (collectively, the "**Infringing Footage**")

27. In addition to directly misappropriating footage, Defendant's Potter's Field Video freely copied Plaintiff's expressive directorial and editorial decisions.

28. Plaintiff's film was edited to music composed by jazz pianist Fred Hersch. Mr. Hersch granted Plaintiff a license to use his music and cut the video to match his musical composition.

29. Defendant's Potter's Field Video includes sequences that imitate the pace, timing, transition sequence and edits of Plaintiff's original Copyrighted Film.

30. The pacing of the original Hersch score is evident in Defendant's Potter's Field Video, even though the actual Haersch music is not.

31. Defendant did not compensate Plaintiff in any way, or even both to credit Plaintiff's work. Plaintiff *received nothing of value* in exchange for Defendant's use of the Copyrighted Film.

**DEFENDANT'S UNLICENSED DISTRIBUTION**

32. Defendant's infringing conduct is not limited to publishing the Potter's Field Video on its own news website. Defendant has also distributed the infringing story to its affiliates and subscribers through Defendant's news service.

33. According to Defendant's website, "Thousands of organizations across the world license AP content"[2] and "Video captured by AP can be seen by over half of the world's population on any given day."[3]

34. Defendant distributed the AP Potter's Field Video to at least the following news organizations:
    a. USA Today
    b. Huffington Post
    c. AOL
    d. Yahoo
    e. Dayton Daily News
    f. KiroTV.com

35. Defendant derives substantial income from licensing news stories out to its affiliates and subscribers.

36. Defendant's affiliates copied, published and displayed the infringing Potter's Field Video.

---

[2] www.ap.org/company/Intellectual-Property
[3] www.ap.org/products-services/video

## DEFENDANT'S WILLFUL CONDUCT

37. Defendant willfully copied, distributed and profited from Plaintiff's Copyrighted Film.

38. Defendant pays careful attention to copyright issues, and takes strong public positions in favor of broad copyright protections.

39. For example, in a March 2010 FTC hearing, AP attorney Laura Malone asserted, "We do need to be able to say that we, the content owners, we, the copyright owners, get to set the parameters by which people can republish our stuff." [4]

40. Defendant's Website includes a page titled, "PROTECTING OUR INTELLECTUAL PROPERTY." This page states:

> When a user licenses content from AP, it obtains permission to use that content *in a specific way*. Thousands of organizations across the world license AP content for legitimate use in their businesses, understanding the value inherent in this content and the investment that went into its production.
>
> When use is made of AP content without authorization, it undermines AP's ability to support its news operations. AP, like any other content creator, must protect its intellectual property rights against unauthorized exploitation. Protecting our journalists' work from misuse and illegal use is of primary importance to the organization, and we are working to develop new ways to ensure our rights.

---

[4] Testimony of Laura Malone, associate General Counsel, intellectual Property, The associated Press, FTC Workshop, "From Town Criers To Bloggers: how Will Journalism Survive The internet age?" (Mar. 9, 2010), Tr. at 67, available at http://www.ftc.gov/opp/workshops/news/index.shtml.

> *Protecting Our Intellectual Property*, The Associated Press, www.ap.org/company/Intellectual-Property (accessed February 20, 2013). See Exhibit C.

41. In addition to a general awareness of copyright issues, Defendant specifically agreed that Plaintiff's Copyrighted Film would not be "copied, reproduced, distributed, transmitted, broadcast, displayed, sold, licensed, or otherwise exploited for any other purposes whatsoever without the prior *written consent* of the respective owners."

42. Before downloading Ms. Hunt's copyrighted Documentary, Ms. Ghosh agreed to the "New Filmmakers Online Terms of Use." (the Filmmaker's Terms"). *See,* newfilmmakersonline.com/terms.aspx.

43. The Filmmaker's Terms include an express notice that the films are protected by copyright. The Filmmaker's Terms state that the Copyrighted Film is for "personal use only and may not be downloaded, copied, reproduced, distributed, transmitted, broadcast, displayed, sold, licensed, or otherwise exploited for any other purposes whatsoever without the prior *written consent* of the respective owners." Filmmaker's Terms, ¶ 5.A (emphasis added). *See* Exhibit B.

44. AP reporter Bonny Ghosh agreed to the Online Terms on Defendant's behalf, downloaded the Copyrighted Film, and used its footage for Defendant's Potter's Field Video.

45. The Defendant knew that Plaintiff owned the Copyrighted Film. The Defendant had discussed various license terms with Plaintiff's executive director.

46. The Defendant knowingly reproduced, broadcast and distributed footage from Plaintiff's Copyrighted Film without a license. Defendant's unlicensed reproduction, display and distribution constitute multiple acts of willful copyright infringement.

# CLAIMS FOR RELIEF

### FIRST CLAIM: DIRECT COPYRIGHT INFRINGEMENT

47. Plaintiff repeats the above allegations as if fully set forth below.

48. Plaintiff owns a valid, registered copyright in the Copyrighted Film. *See* Exhibit A.

49. Defendant copied footage from the Copyrighted Film. Portions of Defendant's Potter's Field Video are *identical* to portions of the Copyrighted Film.

50. Defendant had access to the Copyright film. Defendant's reporter, Ms. Bonny Ghosh, downloaded the Copyrighted Film from the "New Filmmakers Online" website.

51. Defendant's Potter's Field Video literally copies footage from Plaintiff's Copyrighted Film. In addition, Defendant's work imitates the pace, timing, transition sequence and edits of Plaintiff's original Copyrighted Film.

52. Defendant has infringed Plaintiff's copyright by *reproducing* portions of the Copyrighted Film in violation of Plaintiff's exclusive rights under 17 U.S.C. § 106(1).

53. Defendant has infringed Plaintiff's copyright by creating *derivative works* of the Copyrighted Film in violation of Plaintiff's exclusive rights under 17 U.S.C. § 106(2).

54. Defendant has infringed Plaintiff's copyright by *distributing* portions of the Copyrighted Film in violation of Plaintiff's exclusive rights under 17 U.S.C. § 106(3).

55. Defendant has infringed Plaintiff's copyright by publicly *displaying* and *performing* portions of the Copyrighted Film in violation of Plaintiff's exclusive rights under 17 U.S.C. § 106(4) and § 106(5).

56. Defendant either (a) knew that conduct was infringing or (b) Defendant's actions were the result of reckless disregard or willful blindness to the prospect that its conduct was infringing.

57. Plaintiff has been damaged by Defendant's willful copyright infringement.

58. To the extent (if any) that Defendant's use was licensed, such license was revoked on October 22, 2012.

### SECOND CLAIM:  SECONDARY COPYRIGHT LIABILITY

59. Plaintiff repeats the above allegations as if fully set forth below.

60. Defendant knew that its Potter's Field Video used footage from the Copyrighted Film.

61. Defendant knew that its use of the Copyrighted Film was unlicensed.

62. Defendant knew or had reason to know of the underlying direct infringement.

63. With knowledge of this infringing activity, Defendant induced, caused or "materially contributed" to the infringing conduct of the organizations that licensed and re-broadcast the AP's Potter's Field Video.

64. Defendant is subject to *contributory liability* for the infringing actions of Defendant's affiliates and subscribers that copied and published the infringing work.

65. Defendant charged its affiliates and subscribers a licensing fee to republish AP content. By charging a license fee, Defendant has a direct financial interest in the infringing conduct of its affiliates and subscribers.

66. Defendant has the right or ability to control or supervise the infringing activity of its affiliates and subscribers. Defendant could stop or limit its affiliates and subscribers from infringing on Plaintiff's works. For example, Defendant could block access to its archive and servers, preventing its affiliates and subscribers from using the infringing work.

67. Defendant has declined to exercise its right to stop or limit the infringing acts of its affiliates and subscribers.

68. Defendant is subject to *vicarious liability* fro the infringing actions of its affiliates and subscribers that copied and published the infringing work.

### THIRD CLAIM:  REMOVAL OF COPYRIGHT INFORMATION

69. Plaintiff repeats the above allegations as if fully set forth below.

70. The Copyright Act prohibits the removal or alteration of copyright management information.  17 U.S.C. § 1202(b).

71. Defendant downloaded a digital copy of the Copyrighted Film.

72. The Copyrighted Film included copyrighted management information.

73. Defendant edited the Copyrighted Film.

74. Upon information and belief, Defendant's video editing software bypassed, remove, or alter the Copyrighted Film's copyrighted management information.

75. By downloading and editing the Copyrighted Film, and then removing or altering copyright management information, knowing that it will enable, facilitate or conceal copyright infringement, Defendant has violated § 1202(b)(1).

76. By downloading Copyrighted Film, removing Plaintiff's copyright management information, and then distributing the Potter's Field Video with lines crediting the Defendant as author of the entire work, Defendant has violated § 1202(b)(2).

77. By distributing the Potter's Field Video to its affiliates and subscribers, knowing or having reasonable grounds to know that it will enable facilitate or conceal copyright infringement, Defendant has violated § 1202(b)(3).

### FOURTH CLAIM:  CIRCUMVENTION OF COPYRIGHT PROTECTION SYSTEMS

78. Plaintiff repeats the above allegations as if fully set forth below.

79. The Copyright Act prohibits the circumvention of copyright protection systems.

80. Defendants downloaded a digital copy of Plaintiff's Copyrighted Film from the "New Filmmakers" website. *see generally*, www.newfilmmakersonline.com.

81. Defendant downloaded a digital copy of Plaintiff's Copyrighted Film.

82. Upon information and belief, the copy of the Copyrighted Film that defendant downloaded was encoded in the "Quicktime" digital format and protected from editing by technological measures that effectively limited user's access to viewing (rather than editing) the Copyrighted Film.

83. Upon information and belief, Defendant circumvented these technology-based controls in order to edit the Copyrighted Film, in violation of 17 U.S.C. § 1201(a)(1)(A).

84. Defendant's circumvention is not only a violation of 17 U.S.C. § 1201(a)(1)(A), it is also a violation of the New Filmmaker's Terms of Use.

85. Before downloading the Copyrighted Film, Defendant agreed to the New Filmmaker's Online Terms of Use. see, www.newfilmmakersonline.com/terms.aspx, relevant portions excerpted at Exhibit B.

86. Specifically, Defendant agreed to § 5(G) of the Terms of Use, which states:
> You agree not to circumvent, disable or otherwise interfere with security-related features of the NewFilmmakers Website or features that prevent or restrict use or copying of any New Filmmakers Content and/or User Content or en-

>   force limitations on use of the NewFilmmakers Website or the New Filmmakers Content and/or User Content therein.

### FIFTH CLAIM:  UNJUST ENRICHMENT

87. Plaintiff repeats the above allegations as if fully set forth below.

88. Plaintiff's footage and intellectual property are rare and extremely valuable.

89. Ms. Hunt spent years filming and editing the Hart Island documentary. The Department of Correction forbids journalists and the public from accessing Hart Island. Ms. Hunt invested substantial time and energy negotiating a permit for her camera crew.

90. Defendant is a major news organization. Defendant could have used its own resources to negotiate its own permit and sent its own camera crew to Hart Island. Instead, Defendant used Plaintiff's intellectual property without compensation.

91. Other news agencies have used footage from Ms. Hunt's Documentary in the past. They have always done so under license.

92. As a result of this publicity, the HIP website would receive a burst of traffic, and Defendant would receive an influx of donations and spike in DVD sales.

93. Since Defendant's Potter's Field Video did not credit Plaintiff's work or link to Plaintiff's website, Plaintiff received no additional influx of sales and donations.

94. Plaintiff did not intend to make a gift of its Copyrighted Film.

95.  Nothing Plaintiff said or did could reasonably cause Defendant to believe that it was entitled to use Plaintiff's Copyrighted Film without compensation.

96.  Defendant used the Copyrighted Film in programs that it sold and licensed for profit. This constitutes an unreasonable and unjust appropriation of Plaintiff's intellectual property.

97.  Defendant will be unjustly enriched if allowed to retain the benefit of duplicating and distributing Plaintiff's Copyrighted Film without compensation.

## RELIEF REQUESTED

98.  For preliminary and permanent injunctive relief requiring Defendants and Defendants' agents and licensee's cease infringing, whether directly or indirectly, and cease facilitating, encouraging, promoting, and participating in the infringement of Plaintiffs' copyrights.

99.  For the maximum statutory damages of $150,000 per work for all *willful* copyright infringements with respect to each work infringed (17 U.S.C. § 504(c)(2)), or in the alternative, for statutory damages of $30,000 for all copyright infringements with respect to each work infringed. 17 U.S.C. § 504(c)(1).

100. As an alternative to statutory damages at Plaintiff's election prior to final judgment, for an accounting of Defendant's profits attributable to the infringement to be provided by Defendant pursuant to 17 U.S.C. § 504(b), and for payment of such profits and Plaintiff's actual damages suffered from infringement.

101. For statutory damages of $2,5000 *per act* of circumvention, offer, or performance of a service in violation of § 1201 pursuant to § 1203(c)(3)(A).

102. For statutory damages of $25,000 per violation of 17 U.S.C. § 1202 pursuant to § 1203(c)(3)(B).

103. For reasonable attorneys' fees and costs. 17 U.S.C. § 505.

104. For such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

105. Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury.

Dated: 3/12/2013

Adler Vermillion & Skocilich, LLP

By:  /s *Eric Adler*
Eric Adler
Attorney for Plaintiff
45 Main Street STE 500
Brooklyn, NY 11201
347 620 5291
eric@adlervermillion.com